Mr. Justice Hagner
delivered the opinion of the court.
This is an action brought by the plaintiff against the •defendant, upon a promissory note, of which the following is a copy:
■“ $8,500 New York, Feb. 10,1876.
“Six months after date I promise to pay to the order of myself, with interest at 7 per cent., eighty-five hundred dollars, at the office of Justh & Co., 19 Broad street, value received.
“ Gf. A. 'Custer.
-“ Endorsed:
“G-. A. Custer.
“Ben. Holliday.
“Received, New York, March 21, 1878, nine hundred and -twenty-six dollars ($926.00).
“Justh & Co.
A. E., Jr.”
*347 Besides the pleas of non assumpsit and not indebted, the ■defendant interposed the following :
“ And for further plea, the said defendant says that the note in the declaration mention ed was executed by the said Custer, and endorsed by this defendant for the amount of an alleged account' which the said plaintiffs claimed to have against the said Custer, growing out of certain alleged purchases and sales of stock by the said plaintiffs for and on account of the said Custer. And the defendant avers that there were no bona fide sales of stocks by the plaintiffs, to or for said Custer, but the alleged amount for which said note was given was for the difference between the price of 'said stocks at the time of the pretended sale of them by the said plaintiffs to said Custer, or the pretended purchasing thereof by them for him, and the prices thereof at the time of the pretended sale thereof by said plaintiffs for said Custer, and that said Custer did not deal in said stocks, or buy them of or sell them to the said plaintiffs, or buy or sell them through the agency of the said plaintiff's,-or otherwise, and no stocks were ever delivered to said Custer by or through the plaintiff's, or intended so to be, but that the transactions between them, in consideration of which said note was made and endorsed, were -wagers upon the prices of said stocks, and that no other or different consideration passed between the said plaintiff's and Custer, or defendant, for the giving or endorsement of said note, and the defendant did not know, at the time he endorsed the same, what the consideration thereof was.”
Issue was joined upon these pleas, and the case was tried before a jury, which rendered a verdict for the plaintiff'for the amount of the note and interest, after crediting the $926, which the plaintiff stated he had received on account from the estate of Custer.
At the trial, the plaintiff proved the execution and endorsement of the note and its due protest, and there rested.
The defendant thereupon read in evidence the testimony taken under a commission issued on the order of the plaintiff, who was the only witness examined.
*348 He testified in chief, in his own behalf, and was cross-examined by the defendant. There were produced by the plaintiff, and returned with the commission, three communications addressed by General Custer to the plaintiff, and several accounts, which he stated represented the transactions between him and General Custer, so far as he was able to furnish the same. And this being all the evidence in the case, the defendant prayed the court to grant the following instruction:
“If the jury believe from the evidence that the note in the declaration mentioned was given by the said Custer and endorsed by defendant for a balance of accounts, alleged to be due from said Custer to the plaintiff,, and that such alleged balance arose upon alleged purchases and sales of stocks by Justh & Co., in the name of said Custer, or to or for him, and that no stocks so alleged to be purchased by Justh & Co., in the name of said Custer, or alleged to be sold to or for him, were ever delivered to him, aud that it was the intention of the said parties that such stocks should not be delivered to said Custer, but that he should receive only the profits on the alleged purchases and sales of said stocks, if any should be made, or be liable for the losses, if any should occur, then such transactions were illegal, and the plaintiff’ cannot recover.”
The case comes here upon exceptions to the refusal of the court to give this instruction to the jury :
1st. The general principle is well settled as to the conditions which will invalidate contracts of the description referred to in the prayer.
In the excellent work of Mr.. Dos Passos, of the New York bar, on the Law of Stock Brokers, it is thus stated : “ Where a contract is made for the delivery or acceptance of securities at a future day, at a price named, and neither party, at the time of making the contract, intends to deliver or accept the shares, but merely to pay differences, according to the rise or fall of the market, the contract is void, either by virtue of statute or as contrary to public policy.” P. 477-
All observers agree that the inevitable effect of such deal *349 ings is to encourage wild speculations ; to derange prices to the detriment of the community ; to discourage the disposition to engage in steady business or labor, where the gains, though sure, are too slow to satisfy the thirst for gaming when once aroused; and to fill the cities with the bankrupt victims of such disasters as any “ Black Friday ” may develop. As was well expressed in 55 Pa. State, 298, Bruce’s Appeal, “Anything which induces men to risk their money or property without any other hope of return than to get for nothing any given amount from another, is gambling, and demoralizes the community, no matter by what name it may be called.”
The extent of this form of speculation now rife in our country is unprecedented, unless perhaps by the almost universal gambling transactions that distinguished the era of the famous South Sea Bubble.
Mr, Dos Passos states in his work that according to financial authorities the sales of stocks alone, at the New York Stock Exchange, in the year 1881, reached the enormous total of 128,162,466 shares, representing in cash at $106 each share, the prodigious sum of twelve billion eight hundred and sixteen millions two hundred and forty-six thousand dollars. No one doubts that much the larger part of these transactions were illicit as gaming contracts. And wheh it is remembered that this fierce greed for gain without labor has to so great an extent subjected to the same wild speculation the commodities necessary to sustain life, that the humblest housekeeper is frequently the innocent sufferer by mere wagering ti'ansactions, the far-reaching extent of this pernicious traffic may, in some degree, be realized. The plainest principles of propriety and public policy, therefore, should warn the courts to adhere tenaciously to such protection against the further spread of the evil, as they have been able to interpose to the recovery upon contracts ■ originating in stock gambling.
2nd. That the endorser of a note given on account of such ■dealings as are recognized as gaming transactions can rely upon their illegality as a defense to :an action on the -note, *350 was settled as far back as 1794, in the case of Steers vs. Laskley, 6 T. R., 61. There the defendant was engaged in stock-jobbing transactions through a broker, and the plaintiff had acted as one of the referees to determine the amount due to the broker on the dealings. The broker drew upon the defendant to pay part of the adjudged sum. The bill was accepted by the defendant and endorsed by the broker to the plaintiff, who. sued the defendant to recover the amount of the bill. Lord Kenyon non-suited the plaintiff,, being of the opinion that as the bill grew out of a stock-jobbing transaction, which was known to the plaintiff, he could not recover upon it.
In overruling the motion for a new trial his lordship said : “The bill on which the action is brought was given for these-very differences, and Wilson (the broker) could not have enforced payment 'of it. Then the security was endorsed over to the plaintiff, he knowing of the illegality of the contract between Wilson and the defendant, for he was the arbitrator to settle their accounts ; and under such circumstances he cannot be permitted to recover on the bill in a court of law.”
And so the law remains to this time. Dos Passos, 478.
3rd. It was insisted on behalf of the plaintiff that the-present ease should be withdrawn from the operation of the rule as to wagering contracts, since the plaintiff was only the agent of Custer, to negotiate for the stocks with other-persons who should be considered as the principals who made the purchases. ■
But conceding the facts to be as supposed, still that circumstance would not prevent the defendant from interposing this defense. The point has been passed upbn in several of the cases cited in the argument.
In Ex parte Green, 7 Bissell, 342, the court says,'in answering this objection :
“ These parties, it seems to me, fall within the statute. They advanced the margins at the. time .to make the gaming contract, and without their aid in that respect the contracts would not have been made. . * . * ., * So, if these contracts *351 are gaming contracts, they must be held to have advanced the money for margins to make them, and their claim for-repayment falls within the prohibited class mentioned in the-act. They made the illegal contracts and advanced the money required to give them colorable validity. To take-their case out of the statute would be establishing a most flagrant evasion of its provisions.”
So in Gregory vs. Wandell, 39 Michigan, 337, the defendant, the broker, insisted that he ordered the grain from warehousemen in Chicago, and that he had offered the warehouse receipts from these parties to the plaintiff. But his. defense of agency was not suffered to defeat the recovery, it appearing that the whole transaction, though adroitly covered up with convenient entries and the intervention of' suppositious go-betweens, was, after all, a mere wagering-bargain, for a settlement of differences.
We have failed, however, to find in the record, any evidence to show that the plaintiff did purchase any stocks for-Custer from other brokers or any other persons.
So far as the evidence shows, if any stocks were in fact purchased by Custer, they were bought from the plaintiff,, and if any sales of stock were made on account of Custer,, they were made by the plaintiff himself; and hence the-question of agency does not properly arise in the case.
4th. That the ruling of the court was correct in its rejection of the defendant’s prayer has been earnestly argued on. several grounds.
(a) It is insisted that the instruction was faulty, because it denies the plaintiff’s right to recover in case the jury should-find that the parties did not intend ¡the stocks should he delivered to Custer ; whereas, it is argued, that the transactions, might have been perfectly licit, notwithstanding it might have been the intention of the parties that the stock should not be delivered to Custer himself; as, for example, that it should be retained by the broker after purchase and placed, in his strong-box for safe-keeping, until sold upon the owner’s-order.
The language of the instruction is to be considered in the- *352 light of the defenses pleaded in the trial, and which it was designed to present for the opinion of the court by the prayer.
If the defense to an action was usury, and that word were inserted in a prayer offered at the trial, it could scarcely be contended, on appeal, that the instruction was faulty because the word in one sense (and that its primary one) signified legal interest. In view of the character of the defense presented in such an action, it would be practically impossible that a jury of ordinary intelligence would so misunderstand the sense in which the word was employed.
So, in the case at bar, no question was raised or hinted at as to the manual reception into Custer’s possession of the stock; nor was there any point mooted as between its reception by Custer himself and its possession by his agent. Any such question would properly have been regarded as trivial and unimportant, since it is quite clear that if the plaintiff had made a bona fide purchase for Custer, under which the right of property was to pass to his principal, the reception of the property by the broker would have been properly regarded as the equivalent of its reception by Custer himself.
The real question for determination was as to the bonafides of the alleged purchases and sales ; whether, in effecting such alleged purchases, any stock was actually obtained from the possession of any other person and transferred or communicated either to Custer personally or to his agent ; and further, whether it was the intention of the plaintiff and ■Ouster that the stock was to be obtained from the possession of any person and transferred to that of Custer or his agent, so that Custer would take title to what some one else parted with, or whether, on the other-hand, it was their intention, that-there should be' no such surrender of stock by any third person and no equivalent gain of such stock by Custer. And, with the view of presenting this idea of reception of title or interest by the alleged buyer, the expression delivered to Custer ” was used, and in no other. A' purchaser in London this morning, who bona fide has bought stocks by telegraph through a broker in New York, may correctly be *353 said to have had them delivered to him to-day, as a mode of expressing the bona Jides and completeness of the transactson, •while the word would not be applicable to a stock-jobbing bargain concocted between two parties in New York, though sitting side by side in the Stock Exchange. In view of the pleadings and evidence in the case, it is inconceivable that the defendant’s counsel could have thought of placing his case upon the point whether it was the intention of the parties thaf the stocks should be delivered to Custer rather than to ■his broker. The expression, “ and that it was the intention of the said parties that such stocks should not be delivered to ■;the said Custer,” was the equivalent of saying, “ and that it was the intention of said parties that such stocks should not pass lo or become the property of Custer.”
The next member of the sentence is manifestly used in opposition to what just precedes it — ■“ but that he should receive only the profits on the alleged purchase and sales and that opposite sense is only made apparent by rejecting the idea that the previous words “ delivered to said Custer ” only meant to imply the reception of the stock into his own manual possession.
The same expression was used in the sense we have ascribed to it in several well considered cases. Thus in Ex parte Young, 6 Bissell, 65, Judge Blodgett, of the Northern District of Illinois, in citing a decision in that case, says : ■“ Judge Tree held that option contracts for grain, when the parties intended only to pay the differences, and not to deliver the grain, were void as wagering contracts.” And the judge, in the principal case, uses a similar expression : “ The parties when they made the contract did not intend to deliver the grain, but only at the utmost to settle the differences.” See, also, In re Green, 7 Bissell, 344; Yerks vs. Solomon, 18 N. Y. Sup. Ct. (11 Hunn.); North vs. Phillip, 89 Pa. St., 250; Milchor vs. Western Union Telegraph Co., 11 Fed. Rep., 193.
And in the recent unreported case of Roundtree vs. Smith, In the Supreme Court of the United States, the same expression is to be found, as descriptive of a genuine bona fide *354 purchase and sale, as opposed to fictitious one. See, also, Girzewood vs. Blane, 11 C. B., 527.
But even if the proposed construction had been considered faulty because of its supposed equivocal language, we cannot but regard it as an unfortunate omission that no instruction was given in lieu of that proposed. The question involved in the trial was one of great importance, sufficiently presented by the pleadings ; and one which the courts-have-constantly held was for the determination of the jury ; as. was'said in the case in 11 C. B., Girzewood vs. Blane, in which the court left it to the jury to say what was the intention of the parties at the time of making the contract, and whether either party really meant to purchase or sell the shares ; instructing them that if such intention did not exist, the contract was a gambling transaction and void.
By submitting the case to the jury without any instructions after rejecting the only one offered, they were left' without guidance as to the law in a case novel in this jurisdiction, without instruction as to the proper application of the evidence ; and, even without information of the important function expressly devolved upon them of passing upon the intention of the parties to the contract.
It is further insisted that the instruction should have-been refused, because there was no evidence in the case to-sustain the- supposal of the prayer.
It is not our province to decide as to the weight of the-evidence and its sufficiency in fact to sustain the defendant’s position, but only to determine whether the record disclóses evidence sufficient in law to justify the granting of the instruction offered, or of one more explictly stating the law. And after a careful examination of the proofs we are satisfied that there was such evidence before the jury legally sufficient to be submitted for their consideration.
It is well settled that the form of such a transaction is not conclusive. As was said by the court in 11 Hunn., before cited, if is not the form in which the trick or device is presented that avoids the contract, but the intent with which the-scheme was planned. And in Ex parte 7 Bissell, the court *355 says : “ The fact that the parties charged the bankrupt with the price of the grain when he ordered it to be purchased? and credited him with the price it sold for when sold, cannot prove what the real transaction was. That only repreresents the form, not the nature of the transaction. It was as well to keep the account in that way when the real intention was to speculate in and pay only the differences, as when the sale was of the article itself.”
It is in the light of these considerations that the testimony is to be examined.
The parties to this transaction were General Custer, an army officer, and Emil Justh and his partner Frank, Wall street brokers. General Custer met his death bravely among the savage foes of the nation ; and his testimony is absent. Of the survivors, Justh was examined in his own behalf in New York, but his testimony was introduced by the defendant after Justh had declined to read it to the jury. Frank is still employed in Justh’s office in-New York, but he was not examined. Justh produces two-letters and a note from Custer, which are the only statements we have from the deceased respecting the transaction. It seems to us impossible to read these papers without being impressed with the idea that they refer to an illicit business, with which Custer was rather ashamed to be connected. If the indebtedness which had accumulated within the preceding seven months had been the result of legitimate transactions, as of the actual purchase of stock or other property,, or the loan of money, Custer would never have used such language as this : “ I have acknowledged to you verbally and in writing that I am indebted to you, and should you deem it your interest to resort to law, I will certainly, if placed upon the stand, acknowledge the same fact in open court,”' &c. In the second letter he says : “ The circnmstances under which this debt was contracted render my obligation concerning it peculiarly binding, and I consider my honor pledged to effect the discharge of my indebtedness to you at the earliest date practicable.”
Such language men use when speaking of the so-called *356 tl debts of honor,” and not of their legitimate, ordinary money transactions.
The note of December, 1875, bears the same impress. It is in these words : “ My dear Justh : If you will do so, would like you to put a stock order on P. at £ below the opening price, and to sell one thousand L. S. with stop order f above opening price. If you do not feel disposed to do this, please .drop me a line, and send it here by messenger not connected with your office. Yours, G-. A. C.” The poor man showed more caution in this communication than he displayed in his last fatal campaign. "Why should he ask Justh’s permission or consent to sell the stock, if he was realty ordering his own property to be sold ; and why such secresy, that required that the reply should be brought by a messenger not connected with Justh’s office, unless he was engaged in a gambling stock transaction, which he was unwilling should be known ? And these writings are produced by the plaintiff himself.
Justh, the only one of the parties to the contract who was «examined, is a broker of twenty years experience. It is most improbable that he was unacquainted with the state of the law upon this subject, for few classes of persons are more intelligent and shrewd in business affairs than the New York brokers. He must have seen from the commencement of the cross-examination where the pinch of the case was, and that his best chance of gaining it, if he was entitled to do so, w'ould be to make straightforward answers to substantially the same questions repeatedly propounded to him. For it would only have been necessary for him to swear that it was the intention of his firm and Custer, that the purchases and sales of stock were to be bona fide transactions, instead of mere speculations or margins entered into without any intention that any property should be realty bought or sold or change hands, and to support his statement by such accompanying proofs as would be readily forthcoming in any regular, honest transaction of purchase and sale, to secure the amount of his claim. But these answers he studiously and repeatedly refused to give, avoiding a direct reply in every form of subtle evasion.
*357 Thus he was asked on cross-examination : “Was he (Custer) a purchaser of stocks or securities for investment, of for the mere purpose of speculation with the intention that the profits only should be paid to him ? ”
Justh objects to the question, and then answers, “ I do not.”
Again: “Was that your understanding of the arrangement between you — that is, that you should execute orders for him in the purchase or sale of stocks, and that you should pay to him merely the profits accruing to him from these transactions, and that you should not in fact deliver to him the stocks purchased by you? ”
A. “There was no arrangement whatever mentioned.”
Q. “ Was it not your intention in • transacting this business to simply settle differences with General Custer, you paying him any profits in the transactions and he making good any losses ? ”
A. “ Well, I had no intentions expressed or even spoken of. The nature of the business is such that customers have a right to ask for the money they have to their credit.”
Q. (Question repeated.) “Was it your intention ? ”
A. “We had no intentions wdien we received any orders except to execute them ; we only execute orders.”
Q. “In what way did your transactions with General Custer differ, if at all, from the ordinary transactions of brokers buying and selling for customers on a margin ? ”
A. “ In no way.”
And again—
Q. “ When you entered into this business of buying and selling stocks for General Custer, had you yourself any intention to have the stocks paid for by General Custer and delivered to him ? ”
A. “ Brokers have no intentions. I only execute orders, and when executed, the disposition of the stocks is made by the man who gives'the order.”
It is difficult to believe that such responses would have been made by a broker who had been engaged in bona fide purchases and sales of stocks, not denounced by the courts *358 as illicit. Nor is it easy to understand why he did not promptly silence the charge of illegality by a straightforward story that could have been told in a single sentence, if the facts had existed to justify it.
What the broker does say in the progress of his cross-examination is equally significant.
He is asked :
Q. “'Are you able to specify any case in which you bought stocks for the purpose of delivering them to General Custer ? ”
A. “ Impossible. I did not know what his intentions were when he gave me an order.”
Q. “ What were your intentions ? ”
A. “To execute orders given, and to pay for them.”
Q. “ He was dealing on a margin, was he not ? ”
A. “Well, I trusted him, you know, naturally.”
<Q. “ Is that the only answer you can make ? ”
A. “ I trusted him, certainly.”
He explains that the note from Custer of December, 1875, quoted above, was a “ stop order,” which he defines to be a direction to the broker, to buy and deliver stock if the market reached a certain point. He admits that he had dealt in “ puts ” and “ sold stocks short ” for Custer by his direction ; and his testimony abounds throughout in similar expressions from the vernacular of the stock market, which .would naturally be used in describing illicit purchases and sales upon margin.
The statements of the accounts are consistent with dealings of the same character.
The first transaction they refer to is under the date of May 17, 1875. On that day he charges Custer with “ 100 shares of L. S. stock,” at a certain price, and with “ commissions, $12.75.”
Under the same date he credits Custer “ by 100 shares L S. stock, at a stated price, less “ $12.75 commissions.”
Under the date of the 19th of May, there are similar entries of alleged purchases and sales and commissions. On this first venture Custer is represented as the gainer by $188 *359 ■and the broker’s charges for buying and selling the same •stocks amount to $50,.
During the sis months of the speculation the profits, credited to Custer amount to $552, and the broker’s commissions to $1,840, and Custer’s net losses are stated at $8,578. The aggregate of the stock transactions during this period appears to have been $389,983,
It appears that Custer was unable to pay the balance due in December, 1875, and the dividend paid from his estate in 1878 on the claim, would indicate that it could not pay more than ten cents on the dollar.
The disparity between the pecuniary ability of Custer and this immense amount of purchases and sales within half a year’s time, would certainly be regarded by business men as a circumstance iu contradiction of the idea that he intended to make actual contracts so much beyond his means of payment. In In re Green, 7 Bissell, 344, the court, speaking oí a transaction insignificant in comparison with this, sa!ys : “ It is self-evident from the testimony and the condition of the parties that these sales were not bona fide. The bankrupt was not a dealer in grain, he was a country merchant of little or no means, and had no money to invest in wheat, which fact both Green, his brother, and Norris knew. The idea that they bought for him several thousand bushels of wheat with the expectation that he was to pay for it was preposterous.”
It would be infinitely more preposterous to suppose that this broker bought more than a quarter of a million of dollars worth of stock for this soldier within these few months 'with the expectation that he was to pay for it.
Much stress was laid upon the decision of the Supreme ‘Court in the unreported case of Boundtree vs. Smith, above referred to. In that case the coui’t held that there was such an absence of all evidence that the transaction complained of was a gambling in stocks, that the court should not have submitted the question to the jury.
But the facts of that case were widely different fi’om those in the case at bar. There the plaintiff, who was seeking to *360 ■escape from liability, when asked what his intention was when he gave the particular orders — whether he designed an actual purchase or only a speculation in differences — answered : “I cannot say.” And he admitted that he had on other occasions made bona fide purchases from the same broker about the same time. The other party to the contract,, the broker, unequivocally testified that the transaction was in all respects a bona fide purchase and sale ; and the Supreme-Court might well have held that there was. a failure of evidence to sustain the plaintiff’s contention.
In the case at bar, we cannot resist the conclusion that there was abundant evidence legally sufficient to go to the jury, in support of the supposal of the defendant’s prayer ; and believing that the instruction correctly stated the law? we think it was error to refuse it.
Judgment reversed and new trial awarded.